IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Senior Judge Wiley Y. Daniel**

Civil Action No.  11-cv-02850-WYD
Criminal Action No.  09-cr-00157-WYD

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  ALTON JOHN SMITH, a/k/a Austin O. Ikeme,

      Movant.

---

## ORDER

---

I.    <u>INTRODUCTION</u>

      This matter is before the Court in connection with Movant Alton John Smith's *pro se* Motion and Amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence.[1]  The motions are fully briefed.  Also pending are Mr. Smith's motions to expand the record, motion for new trial, and motion for an evidentiary hearing.

II.    <u>FACTUAL BACKGROUND</u>

      On February 20, 2010, a jury found Mr. Smith guilty of four counts relating to bank fraud and aiding and abetting in violation of 18 U.S.C. §§ 1344 and 2.  Judgment was entered on July 1, 2010.  Mr. Smith appealed three of the four fraud counts (Counts

---

[1] I found that Mr. Smith's original 2255 motion did not comply with the Rules Governing Section 2255 Proceedings for the United States District Court, and that the motion was insufficiently clear and concise to allow the Court or the government to know precisely how Movant believed his rights had been violated and why Movant believed he was entitled to relief.  Mr. Smith was thus ordered to file an amended 2255 motion. (ECF No. 147.)

One through Three) and sought resentencing on Court Four.  The Tenth Circuit affirmed.  *United States v. Smith*, 431 F. App'x 617 (10th Cir. April 28, 2011) (not selected for official publication).

As explained by the Tenth Circuit, "Count One (First Mortgage Count) alleged Mr. Smith, using the fictitious identity of Austin Ikeme, a false Social Security number, date of birth, and other false identification documents, knowingly attempted to execute or executed a scheme to defraud Wells Fargo by submitting a mortgage loan application containing fictitious information and supported by false documentation, including fake income and payroll documents associated with Marrick Entertainment and false bank statements from a Bank of the West checking account, for the purpose of obtaining a loan in the amount of $982,000 for the purchase of a home at 5686 Vistancia Court, Parker, Colorado." *Smith*, 431 F. App'x at 623 n. 4.  "Count Two (Second Mortgage Count) adopted most of Count One's description of the overall scheme and alleged Mr. Smith, using the Ikeme identity, knowingly executed or attempted to execute a scheme to defraud Wells Fargo by submitting a home equity line of credit application to be secured by the property at 5686 Vistancia Court." *Id.*  "Count Three (Line of Credit Count) similarly adopted the overall scheme described in Count One and alleged Mr. Smith, using the Ikeme identity, knowingly executed or attempted to execute the scheme to defraud Wells Fargo by submitting an application for a personal line of credit in the amount of $49,700." *Id.*  "Finally, Count Four (Automobile Loan Count) also adopted most of Count One's description of the overall scheme and alleged Mr. Smith, using the Ikeme identity, knowingly executed or attempted to execute a scheme to

defraud Security Service by submitting an application for an automobile loan in the

amount of $42,834 and secured by a 2008 Chrysler Aspen." *Id.*

The Tenth Circuit in *Smith* also explained the procedural background of the case:

Mr. Smith pled not guilty to an indictment charging him with four counts of fraud, in violation of 18 U.S.C. §§ 2 and 1344(1), against Wells Fargo, a banking institution with branch offices in Denver, Colorado; and Security Service Federal Credit Union, another Denver financial institution. During his trial the government presented witness testimony and other documentary evidence in support of its case against Mr. Smith. At the conclusion of the government's evidence, Mr. Smith offered no testimony or other evidence to rebut its evidence or in support of his defense but moved for acquittal on all four counts, arguing the government failed to prove he is the individual who committed the fraudulent acts or otherwise provide documents on which the fraudulent acts were perpetrated. The district court denied the motion to acquit, and the jury found Mr. Smith guilty of fraud on all four counts. Thereafter, the district court sentenced him to sixty months imprisonment on each count, to run concurrently.

Through counsel, Mr. Smith now appeals his convictions on three of the four fraud counts, renewing his argument the government failed to prove he is the individual who committed the fraud perpetrated against Wells Fargo and, as a result, claiming the district court erred in denying his motion for acquittal. While he concedes the government proved someone using the fictitious name of Austin Ikeme and fraudulent documents obtained three different loans from  Wells Fargo, he argues it failed to prove he was the person who used that identity to obtain the loans or who furnished the fraudulent documents. As to the fourth fraud count concerning an automobile loan, Mr. Smith now concedes the government proved he used the fictitious name Austin Ikeme and provided fraudulent documents to obtain his automobile loan from Security Service. However, he requests resentencing on that count. Finally, in a pro se reply brief which we granted Mr. Smith permission to file, he claims the government failed to prove two of the entities affiliated with Wells Fargo and Security Service and involved in the fraudulent transactions are "FDIC-insured" or "financial institutions," as required for his convictions.

*Smith*, 431 F. App'x at 618.  I adopt herein the Tenth Circuit's detailed description of the

testimony and other evidence contained in the trial record and presented at trial, rather than repeating it in this Order.  *See id.* at 618-24.

The Tenth Circuit rejected Mr. Smith's arguments on appeal.  It first found that "it is clear from the evidence admitted at the trial a reasonable jury could find Mr. Smith guilty beyond a reasonable doubt of the mortgage loan fraud committed, and, therefore, the government's evidence supported the district court's denial of Mr. Smith's motion to acquit." *Smith*, 431 F. App'x at 624.  It then detailed the evidence which it relied on for that finding, *id.* at 624-26, and found based "on much of the same or similar direct and circumstantial evidence" that "a jury could also find Mr. Smith guilty beyond a reasonable doubt of perpetrating the fraud committed concerning the personal line of credit loan from Wells Fargo." *Id.* at 626.  The Tenth Circuit declined to consider Mr. Smith's argument for resentencing on the automobile loan count as the argument was inadequately briefed. *Id.* at 627.  Finally, it rejected as frivolous Mr. Smith's argument that two of the entities affiliated with Wells Fargo and Security Service and involved in the fraudulent transactions were not "FDIC-insured" or "financial institutions", as required for his convictions. *Id.* at 627-28.

Mr. Smith's  2255 motion asserts several Sixth Amendment violations.  First, he argues ineffective assistance of counsel in connection with his representation at trial by Charles Elliott, as he asserts that "Mr. Elliott's failed attempt to withdraw contaminated the remainder of" his case and prejudiced him because he was represented by counsel who had an "irreconcilable conflict" with him.  (Am. Mot. to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255, ECF No. 164  ["Am. Mot."], at 5.)

Second, Mr. Smith alleges that trial counsel Mr. Elliott rendered ineffective assistance of counsel by failing "to hold the government to shouldering its burden of proving every element of the charge" and "by not having knowledge of the applicable standard of law at trial."  (Am. Mot. at 5, 10.)  He asserts in support of that claim that Mr. Elliott failed to investigate the discovery and show that Colorado Mortgage Alliance and Centennial Leasing were wholly owned subsidiaries of Wells Fargo and Security Service and were not financial institutions, nor FDIC insured, within the meaning of the bank fraud statutes.  He further asserts that Mr. Elliott's performance was deficient in informing the court and jury that "'the evidence will show you, they new [sic] that Alton Smith couldn't buy a house for a million-two.  But Austin Ikeme could, because James Kinney had handed Ben Serrano and Kim Meyers a name with a credit score of 786.'"  (Am. Mot. at 6) (quoting Opening Statement at 15 l. 3-6.)  In that regard, it appears that Mr. Smith is suggesting that Mr. Elliott ignored and failed to interview unspecified "potential witnesses" about certain documents provided in discovery that could indicate another person, James Kinney, was also falsely using the identity Austin Ikeme.[2]

III.   ANALYSIS

   A.   The Motions to Expand the Record and for a New Trial

Before addressing the merits of the § 2255 motion, I first address Mr. Smith's motions to expand the record in relation to his § 2255 claim and then his motion for a new trial.  Mr. Smith's first motion to expand the record (ECF No. 169) relates to his

---

[2]  Mr. Smith refers to "James Kinney" and "James Kenny" in his amended § 2255 motion, as well as a "James Kenney" in a document attached to the motion.  These all appear to be references to the same person.  I will refer to the person as James Kinney.

argument that counsel was ineffective in failing to interview witnesses who could have established that another person was falsely using the identity of or had assumed the identity of Austin Ikeme (on occasions other than those which constitute the charged offenses).  Mr. Smith proffers several exhibits that, in his view, show "a different set of facts than was given by Mr. Wood under oath."  (Mot. to Expand the Record, ECF No. 169 at 3.)  In other words, Mr. Smith seeks to introduce the exhibits to show they would have impeached the testimony of Nicholas Michael Wood, a witness who had identified him as Austin Ikeme.

I find that the motion to expand the record to consider these documents relevant to Mr. Wood should be denied.  The exhibits do not support Mr. Smith's claim that counsel failed to interview potential witnesses.  To the extent that they support an attack on the judgment, they do so via a distinct claim that was not included in Mr. Smith's § 2255 motion; namely, that counsel was ineffective in failing to impeach Mr. Wood, one of the government's witnesses.  Mr. Smith's attempt to amend his § 2255 motion through a motion to expand the record is improper.  *Cf. United States v. Espinoze-Saenz*, 235 F.3d 501, 505 (10th Cir. 2000) (an untimely amendment to a § 2255 motion may "relate back" to the original motion, but only if it clarifies or amplifies existing claims; the motion cannot be considered if it adds separate and distinct claims).

Mr. Smith's second motion to expand the record (ECF No. 170) seeks to introduce 22 exhibits for the Court's consideration that purportedly show that Colorado Mortgage Alliance and Centennial Leasing and Sales were not FDIC-insured.  As this

-6-

motion seeks to introduce records that are directly relevant to Mr. Smith's § 2255 motion, I will grant the motion.

Finally, Mr. Smith's third motion to expand the record (ECF No. 171) seeks to introduce two exhibits that he argues supports an inference that "another person [was] acting as Austin Ikeme, before the actual fraudulent acts were tak[ing] place". (ECF No. 171 at 4.)  Again, since the motion seeks to introduce records that are directly relevant to Mr. Smith's § 2255 motion, I will grant the motion.

I now turn to Mr. Smith's motion for new trial under Fed. R. Crim. P. 33 (ECF No. 175.)  Arguing under the rubric of "newly discovered evidence," Mr. Smith asserts that he has material evidence that the government submitted false evidence and/or material misstatements of fact to the jury during trial through its witness Mr. Wood.  He argues in that regard that Mr. Wood committed perjury by stating that Mr. Smith was the person he met using the fraudulent name Austin Ikeme in regard to the car loan. Mr. Smith argues that he was prejudiced by this false and misleading testimony because it led the jury to believe that he was the person who was impersonating Austin Ikeme in the alleged bank fraud conspiracy.

Turning to my analysis, Fed. R. Crim. P. 33 provides that "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice. . . ."  A motion for a new trial "is not regarded with favor and should only be granted with great caution." *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997); *see also United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987) ("Courts disfavor new trials, and exercise great caution in granting them").

I find that Mr. Smith's motion for a new trial must be denied. While he characterizes the motion as one based on newly discovered evidence, he has not identified any evidence that would qualify as newly discovered. Instead, he simply is referring to certain testimony of Mr. Wood from trial and characterizing it in a way that he deems false. There is nothing newly discovered about this. *See United States v. Jones*, 369 F. App'x 937, 940 (10th Cir. 2010) (motion for new trial was properly denied as untimely because "[t]he ATF agent's trial testimony certainly cannot qualify as evidence [that the defendant] discovered after his trial"). As a result, the motion for a new trial is not timely. *See United States v. Montgomery*, 506 F. App'x 823, 825 (10th Cir. 2013) ("'any motion for a new trial grounded on newly discovered evidence must be filed within 3 years after the verdict,' while '[a]ny motion for a new trial grounded on any other reason . . . must be filed within 14 days after the verdict.'" (quoting Fed. R. Civ. P. 33(b)).

Moreover, while Mr. Smith argues that the prosecution presented perjured or false testimony, he has not presented any evidence to support this argument. "[N]othing in the record substantiates [Mr. Smith's] assertion that [Woods'] testimony was false, let alone that the prosecution knew the testimony was false." *Johnson v. Mullin*, 505 F.3d 1128, 1154 (10th Cir. 2007). The testimony cited of Mr. Wood was not "'incredible on its face'", *id.*, and Mr. Smith has not demonstrated why the testimony was false. Inconsistencies in testimony "are matters within the province of the jury" as is determining the weight and credibility of witness testimony. *Tapia v. Tansy*, 926 F.2d 1554, 1562 (10th Cir. 1991). The court must thus "presume that the jury's

findings in evaluating the credibility of each witness are correct." *Id.* Accordingly, I find no merit to Mr. Smith's motion for new trial.

      B.    <u>The 2255 Motion</u>

      1.    <u>Introduction</u>

I must construe liberally the § 2255 motion because Mr. Smith is representing himself. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, I should not be the *pro se* litigant's advocate. *See Hall*, 935 F.2d at 1110.

With regard to Mr. Smith's claims regarding the allegedly ineffective help from his counsel, Mr. Elliott, those allegations are analyzed under the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984). In order to prevail under that case, it must be shown both that counsel's performance was deficient and that the deficient performance prejudiced his defense. *Id.* at 687; *see also Miller v. Champion*, 161 F.3d 1249, 1254 (10th Cir. 1998).

With respect to the first prong of the *Strickland* test, Mr. Smith must show that counsel made errors so serious that he was not functioning as the counsel guaranteed by the Sixth Amendment. *Strickland,* 466 U.S. at 687. Further, Mr. Smith must show that counsel's representation fell below an objective standard of reasonableness. *Id.* at 688. "Judicial scrutiny of counsel's performance must be highly deferential", however, and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. That is, Mr. Smith "must overcome the

presumption that, under the circumstances, the challenged action 'might be considered sound strategy.'" *Id.* (quotation omitted).

Mr. Smith can make out a claim of ineffective assistance of counsel only by pointing to specific errors made by counsel. *United States v. Cronic*, 466 U.S. 648, 666 (1984); *see also Strickland*, 466 U.S. at 690. "The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A difference of opinion as to trial tactics generally does not constitute ineffective assistance. *See United States v. Mayo*, 646 F.2d 369, 375 (9th Cir. 1981); *see also Anderson v. Att'y Gen. of Kan.*, 425 F.3d 853, 859 (10th Cir. 2005) ("Whether to raise a particular defense is one aspect of trial strategy, and informed 'strategic or tactical decisions on the part of counsel are presumed correct, unless they were completely unreasonable, not merely wrong.'") (quoting *Bullock v. Carver,* 297 F.3d 1036, 1047 (10th Cir.2002) (internal quotation marks omitted)).

Regarding the second prong of the test, Mr. Smith "must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In other words, even where particular errors are shown, the movant "must show that they had an adverse effect on the defense", and not just some conceivable effect." *Id.* at 693. Thus, Mr. Smith "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been entirely different." *Id.* at 694. "A reasonable probability is

a probability sufficient to undermine confidence in the outcome." *Id.* "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

After reviewing the entire file, I deny the § 2255 motion and amended motion for the reasons discussed below.

      B.    <u>The Merits of Mr. Smith's Claims</u>

           1.    <u>Claim One</u>

I first address Mr. Smith's argument in Claim One that he received constitutionally deficient representation because his counsel moved to withdraw before trial, was denied permission to withdraw by the Court, and had "irreconcilable conflicts" with Mr. Smith during trial.  Mr. Smith asserts that the Court recognized the conflict after trial and its effect on his case when it granted Mr. Elliott's renewed motion to withdraw filed on May 3, 2010 (ECF No. 77.)  At this point, according to Mr. Smith, the damage had already been done.  He cites *United States v. Swanson*, 943 F.2d 1070 (10th Cir. 1990), and argues that by filing the motion to withdraw, his counsel abandoned his "duty of loyalty to his client" and "join[ed]" the government's effort to obtain a conviction, thereby transforming the representation Movant received into "a tenuous and unacceptable legal fiction."  (Am. Mot., Attachment at 3.)

I agree with the government that Mr. Smith is arguing that his Sixth Amendment right to counsel was violated in two contradictory ways: (1) because his counsel sought to withdraw before trial because of "irreconcilable conflicts" with him about how to proceed with the case; and (2) because, despite such actual "irreconcilable conflicts",

his counsel did not withdraw after the court denied the withdrawal motion and represented him at trial.  Thus, Mr. Smith claims his constitutional right to counsel was violated both because Mr. Elliott tried unsuccessfully to remedy "irreconcilable conflicts" that he perceived existed before trial in how the case should proceed, and because Mr. Elliott did not withdraw after he was denied permission to withdraw by the Court.

With respect to the first contention, it appears Mr. Smith is arguing that the mere filing by his counsel of a motion to withdraw constituted ineffective assistance of counsel.  However, Mr. Smith does not suggest an objectively reasonable alternative course of action that his counsel should have taken to attempt to remedy the 'irreconcilable conflicts" that Mr. Smith now insists existed throughout the proceedings before the Court, *i.e.,* which alternative course of action would have been within the wide range of reasonable professional assistance.  Rather he contends, in conclusory fashion, that the filing of the withdrawal motion violated his Sixth Amendment right to counsel, *ipso facto*.  This argument must be rejected.

There is simply no basis for this Court to find that the filing of such a motion *ipso facto* violated Mr. Smith's Sixth Amendment right to counsel, and Mr. Smith has not cited any authority in support of this argument.  Indeed, by its very nature, a motion by counsel to withdraw is designed to ensure that his client receives effective representation by new counsel when there is a conflict of interest or a breakdown in communication.   Likewise, there is no basis for the Court to find that counsel's continued representation of his client when a motion to withdraw is denied *ipso facto* constitutes a violation of the client's Sixth Amendment right to counsel.

Adding to the contradictory nature of Mr. Smith's claim is the fact that he now alleges that the "irreconcilable conflicts" about how to proceed with his case existed when his counsel initially filed the motion to withdraw before the trial – "irreconcilable conflicts" that Mr. Smith insists prevented him "from being represented by conflict free counsel" at trial.  However, during the hearing the Court conducted on the original withdrawal motion, Mr. Smith denied any such conflicts.  The following exchange occurred between the Court and Mr. Smith:

> COURT: . . . Can you and Mr. Elliott patch up whatever differences you have regarding his representation of you?
>
> Again, I'm not asking you to go into any details of what those [] differences are. Do you think you can resolve your differences?
>
> DEFENDANT: Do I go with what is on the withdrawal motion? Can I go off of what is on the withdrawal?
>
> COURT: It's a question sort of independent of the motion, but it relates to the motion. What I'm asking you is, do you believe if you can't get Mr. Rolfe to enter his appearance because you can't raise the money, what are the probabilities that you and Mr. Elliott can resolve whatever differences you may have?
>
> DEFENDANT: I don't understand why the withdrawal is taking place.
>
> COURT: I'm sorry?
>
> DEFENDANT: I don't understand why the withdrawal has been taking place. Example of why the withdrawal has been taking place, it's not of knowledge to me.
>
> COURT: Oh, you mean you – are you saying, you and Mr. Elliott haven't talked about the specifics of that?
>
> DEFENDANT: As in why he's withdrawing on here?
>
> COURT: Right.

DEFENDANT: No, it's not the same. I haven't spoken to him about payment. I have it on – I have October – December 12 the last payment we talked about. So I haven't talked to anybody about payment including Mr. Elliott. I paid him some money already, but I haven't paid him – what I was told to fill out affidavit for this Court. I've done that, and I got down to the Sheriff's Office. Of my knowledge, it was done. Nothing else since April 17 that has been addressed to me about payments. But all of a sudden, I have a withdrawal. I don't understand.

COURT: So you don't understand Mr. Elliott's motion to withdraw; is that what you're saying?

DEFENDANT: No, sir.

COURT: I mean, yes, you don't understand it?

DEFENDANT: Correct. I'm sorry.

(ECF No. 129, Hearing Tr. of Sept. 89, 2009, at 5-6.)

Mr. Elliott responded with the following clarification, to which Mr. Smith did not

reply:

Judge, it is not a question of monetary payment. As the Court knows, this is an appointment pursuant to the Criminal Justice Act. It has nothing to do with that. It is really a breakdown in communications I think in every regard. And I have spoken to Mr. Smith about that when we met prior to the change of plea. It was initially continued because Mr. Smith told me on that date he was not desirous of going forward, but, rather, desirous to proceed to trial. We spoke about the tactical determinations, if you will, and status of the case. When we agreed to waive Indictment in this matter, as the Court knows, was brought by way of Information with the waiver of that Indictment.

There are various issues in terms of our communication, which [leaves] me I believe in a position that is rather untenable, in terms of both my negotiations with Mr. Kirsch and my representations to the Government as part and parcel of those negotiations. I have no desire to say anything ill of Mr. Smith that might detrimentally impact him.

This has nothing to do with monetary payment, Judge. The [c]ourt's allowed me to withdraw in the state court. That's a different issue completely. And there are no moneys owed in regard to this case because

> it is a court appointment. We have spoken as to concerns I had and the reasoning behind Mr. Smith's desire to not enter into the disposition.

(*Id.* at 6-7.)  The Court then noted that Mr. Elliott, not Mr. Smith, was requesting

counsel's withdrawal, and in the absence of any indication by Mr. Smith that he shared

any of Mr. Elliott's concerns about the existence of "irreconcilable conflicts," denied the

motion to withdraw.  (*Id.* at 7-9, 12-13.)

Only now, for purposes of collateral attack, does Mr. Smith assert that there

existed "irreconcilable conflicts" between himself and his counsel before and during trial

that prejudiced him.  The record belies this assertion.  First, Mr. Elliott referred to a

breakdown in communications as the basis of the problem.  The Court indicated that its

denial of the original motion to withdraw was predicated on the absence of sufficient

evidence of a breakdown in the attorney-client relationship before the trial, but that the

denial was without prejudice to the filing of another such motion if legitimate conflicts

between Mr. Smith and his counsel occurred subsequently.  (ECF No. 129, Hearing Tr.

of Sept. 8, 2009, at 13.)  No such motion to withdraw was made during the trial. Further,

while Mr. Smith argues that the court recognized the conflict and its effects on the case

by granting Mr. Elliott's motion to withdraw filed after the trial, this is not true.  Counsel's

renewed motion to withdraw after the trial was premised chiefly on events that occurred

after the trial.  (ECF No. 77, ECF No. 131, Hearing Tr. of May 5, 2010 at 11-13.)  Only

*after* the trial did Mr. Smith indicate that he believed that irreconcilable conflicts existed

between himself and his counsel such that Mr. Elliott's withdrawal would be appropriate.

(ECF No. 131, Hearing Tr. of May 5, 2010, at 15-20.)

Moreover, Mr. Smith does not identify or express what the alleged "irreconcilable conflicts" are.  As noted by the Supreme Court, "prejudice is presumed *only* if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance." *Strickland*, 466 U.S. at 692 (emphasis added) (quotation omitted).  Here, Mr. Smith has not identified any conflicting interests or how any alleged conflicts adversely affected his counsel's performance.  Thus, he cannot prevail on this claim.

Rather than an actual conflict of interest, it appears from the record that the motion to withdraw before trial came about due to differences in opinion in trial strategy. (ECF No. 129, Hearing Tr. of Sept. 89, 2009, at 6-7.)  However, Mr. Smith did not identify any such differences in opinion or how any alleged differences affected case tactics.  "Certainly, a mere assertion that there was a personality conflict that caused differences of opinion on how to present the case is insufficient to meet the *Strickland* standard."  *United States v. Carnicle*, No. 89-5295, 1990 WL 37615, *2 (6th Cir. April 3, 1990) (unpublished); *see also Brackett v. United States*, Civil Action No. 3:10-CV-30, Criminal Action No. 3:08-CR-056-2, 2012 WL 246059 (N.D.W.Va. Jan. 26, 2012) (even if there were "communication and trust problems, . . . the Sixth Amendment does not guarantee a 'meaningful relationship'") (quoting *Morris v. Slappy*, 461 U.S. 1, 14 (1983)).  To the extent Mr. Smith alleges deficiencies in performance on the part of his counsel that allegedly occurred during trial, I note that he does not raise them in the context of an "irreconcilable conflict" in connection with the motion to withdraw, but as part of his second claim which I address in Section III.B.2, *infra*.

I now turn to Mr. Smith's argument that after the Court denied Mr. Elliott's initial motion to withdraw from the case, his counsel continued to represent him despite counsel's belief that irreconcilable conflicts existed in the attorney-client relationship between them (a belief that Mr. Smith apparently did not share at the time). This argument is not cognizable and is procedurally barred under § 2255. First, Mr. Elliott did not identify any conflict(s) as the basis for his motion to withdraw. Thus, there is no evidence to support Mr. Smith's argument that his counsel believed that conflicts existed during the representation at trial.

Second, as the government notes, without the Court's permission to withdraw from the case, Mr. Elliott was not free to cease his representation of Mr. Smith. Thus, to the extent that Mr. Smith argues that his constitutional rights were violated by his counsel's continued representation of him following the Court's denial of the initial withdrawal motion, he cannot claim error on his counsel's part in this regard. Instead, this appears to be a tacit argument that the Court abused its discretion or otherwise erred by denying Mr. Elliott's motion to withdraw. Such an allegation of error by the Court is not cognizable, and is procedurally barred under § 2255.

Section 2255 is not a proper vehicle for directly challenging the decisions of a trial court as to a ruling on a motion to withdraw. Instead, "[a] 28 U.S.C. § 2255 petition attacks the legality of the detention." *Bradshaw v. Story*, 86 F.3d 164, 166 (10th Cir. 1996). "'The purpose of section 2255 is to provide a method of determining the validity of a judgment by the court which imposed the sentence. . . .'" *Id.* (quoting *Johnson v. Taylor*, 347 F.2d 365, 366 (10th Cir. 1965)). Here, to the extent that Mr. Smith is

unhappy with the fact that the Court denied Mr. Elliott's motion to withdraw, causing

Mr. Elliott to continue to represent him, that is not an attack on the legality of his

detention.  Mr. Smith does not show that he suffered the violation of his Sixth

Amendment right to counsel or any other constitutional right through the denial of the

motion to withdraw, as discussed above, and an argument that the Court erred by

denying his motion to withdraw should have been addressed in the direct appeal, not in

this collateral attack under § 2255.

Further on that issue, Mr. Smith's claim of error in connection with the denial of

the motion to withdraw, which necessitated that his counsel continue to represent him,

is procedurally barred in that it should have been raised (if at all) on direct appeal.

Ordinarily, issues not raised by a party on appeal are deemed waived.  *United States v.*

*Wiseman*, 297 F.3d 975, 979 (10th Cir. 2002).  "[Section] 2255 is not available to test

the legality of matters which should have been raised on appeal."  *United States v.*

*Allen*, 16 F.3d 377, 378 (10th Cir. 1994); *see also United States v. Frady*, 456 U.S. 152,

167-68 (1982) (failure to make a contemporaneous objection); *United States v. Khan*,

835 F.2d 749, 753-54 (10th Cir. 1987) (failure to raise issue on direct appeal).

Section 2255 provides "an extraordinary remedy and will not be allowed to do

service for an appeal."  *Bousley v. United States*, 523 U.S. 614, 621 (1998).  "Where a

defendant has procedurally defaulted a claim by failing to raise it on direct review, the

claim may be raised in *habeas* only if the defendant can first demonstrate either 'cause'

and actual prejudice, or that he is actually innocent."  *Id.*  Here, Mr. Smith does not

attempt to demonstrate cause and prejudice for his procedural default, nor does he

contest that this claim is procedurally defaulted.  I further note that all of the facts on

which Mr. Smith's claim is based were known or available to him when the judgment of

this Court was entered and could have been raised in a timely direct appeal.  There is

also nothing in the record that suggests that Mr. Smith is actually innocent of the

offense for which he was convicted.  This portion of Claim One is therefore procedurally

barred in the instant collateral proceeding under § 2255.

       2.    Claim Two

       a.    Mortgage Alliance and Centennial Leasing

    I now turn to Mr. Smith's argument that Mr. Elliott rendered ineffective assistance

of counsel by failing "to hold the government to shouldering its burden of proving every

element of the charge" and "by not having knowledge of the applicable standard of law

at trial."  (Am. Mot. at 5, 10.)  In support of that argument, Mr. Smith first asserts that his

counsel was deficient in failing to investigate the discovery and show that Colorado

Mortgage Alliance and Centennial Leasing were wholly owned subsidiaries of Wells

Fargo and Security Service and were not financial institutions, nor FDIC insured, within

the meaning of the bank fraud statutes.

    Mr. Smith alleges in that regard:

> The second error committed by Mr. Elliott showing obvious deficient
> performance, diminished even more informed the court [*sic*] "that was a
> transition process from Centennial, to Ferrero, to eventually the underlying
> lender." Simply put, Colorodo [*sic*] Mortgage Alliance and Centennial
> Leasing were both wholly-own [*sic*] subsidiaries of the two banks, the
> subsidiaries were not "FINANCIAL INSTITUTIONS, NOR [*sic*] FDIC-
> INSURED" within the meaning of the bank fraud statutes.

(Am. Mot., Attachment at 3-4 (citation to record omitted)).  To this, Mr. Smith adds the

following assertions:

> Counsel prejudiced me by not investigation [*sic*] the government's discovery.
> Counsel's errors were so serious that it deprived me of a fair trial; a trial
> whose result is reliable which is my Sixth Amendment right.

(*Id.* at 6.)

Mr. Smith focuses on the "financial institution" element of the bank fraud statute,

18 U.S.C. § 1344, following which he points to (1) testimony at trial indicating that

individuals employed by Colorado Mortgage Alliance and Centennial Leasing received

the supporting documentation for the Wells Fargo and Security Service loan

applications; (2) testimony at trial indicating that Security Service "paid the dealership to

purchase" the [automobile] loan under the credit union's indirect lending program;

and (3) a notice to "Austin O. Ikeme," including the acknowledging signature "Austin O.

Ikeme" (provided by the government in discovery), that the servicing of his Wells Fargo

mortgage loan (*i.e.*, the receipt of payments) was being transferred from Colorado

Mortgage Alliance to Wells Fargo Home Mortgage.  (*Id.* at 4-6.)  He further attaches

documents to his motion to expand the record (ECF No. 170) which he contends

support his claim.

Mr. Smith's claim appears to be, in essence, that his counsel provided

constitutionally deficient representation by failing to properly investigate and assert, on

the basis of the documents provided by the government in discovery, that Mr. Smith did

not defraud an "FDIC-insured financial institution," because neither Colorado Mortgage

Alliance nor Centennial Leasing are federally-insured financial institutions:

> At this point counsel (Mr. Elliott) has clearly abandoned the applicable standard in such an instance when evidence and testimony clearly suggest that the defendant didn't defraud a "financial institution."

(Am. Mot. at 6.)

I find no merit to this claim of ineffective assistance of counsel.  Indeed, the

Tenth Circuit expressly considered–and rejected as "frivolous"–this specific argument

on Mr. Smith's direct appeal:

> In his pro se reply brief, Mr. Smith concedes the government's evidence established Wells Fargo and Security Service were "FDIC-insured" for the purpose of proving the elements of fraud against him. However, he argues the government failed to submit evidence also establishing Colorado Mortgage Alliance, which facilitated the mortgage loans, and Centennial Leasing and Sales, which facilitated the automobile loan, are also "FDIC-insured" or "financial institutions" for the purpose of convicting him on either the mortgage or automobile loans. In support, he claims "[t]he mortgage lender and car broker were . . . wholly-owned subsidiaries of the two banks, [and] the subsidiaries were not "(financial institutions) ["] within the meaning of the bank fraud statutes [sic]."
>
> Even if we consider this argument, which was also not presented in Mr. Smith's opening brief, we would deem his contention frivolous. This is because the indictment against Mr. Smith alleged he attempted to execute or executed a scheme to defraud Wells Fargo Bank, "a financial institution whose deposits were insured by the Federal Deposit Insurance Corporation," and "Security Service Federal Credit Union, . . . a financial institution whose deposits were insured by the National Credit Union Share Insurance Fund." The record on appeal shows Wells Fargo is, in fact, the financial entity from which Mr. Smith ultimately obtained the mortgage loans, and Security Service is the financial entity which ultimately provided the automobile loan to him based on his same or similar fraudulent representations. It also shows Mr. Smith defaulted on their loans, making them the victims of his fraudulent schemes. As Mr. Smith concedes, the government provided evidence establishing Wells Fargo and Security Service were "FDIC-insured" and "financial institutions" for the purpose of proving the elements of fraud against him.
>
> While Colorado Mortgage Alliance and Centennial Leasing and Sales may have initially furnished Mr. Smith the application forms and otherwise

> facilitated his loans, neither Colorado Mortgage Alliance nor Centennial
> Leasing and Sales ultimately loaned him the money from which a loss
> occurred due to Mr. Smith's fraudulent conduct. Therefore, the government
> was not required to provide evidence showing Colorado Mortgage Alliance
> and Centennial Leasing and Sales were "FDIC-insured" or "financial
> institutions." Accordingly, even if considered on appeal, Mr. Smith's pro se
> argument is frivolous.

*Smith*, 431 F. App'x at 627.

Under the law-of-the-case doctrine, courts typically are precluded from reconsidering arguments asserted in a § 2255 motion that were raised and adjudicated on direct appeal. *Abernathy v. Wandes*, 713 F.3d 538, 549 (10th Cir. 2013). An exception exists if there has been an intervening change in the law, *id.* 550 n. 11, but Mr. Smith has not alleged any change in the law. While Mr. Smith does attempt to distinguish his argument made in the direct appeal (that the *government* failed to submit evidence) from his argument in the § 2255 motion (that *counsel* didn't investigate the government's discovery) (Reply at 8), this is a distinction without a difference. The Tenth Circuit's finding that neither Colorado Mortgage Alliance nor Centennial Leasing and Sales ultimately loaned him the money from which a loss occurred due to Mr. Smith's fraudulent conduct renders the arguments both on direct appeal and in the § 2255 motion without merit. Since Colorado Mortgage Alliance and Centennial Leasing and Sales did not loan him the money, there was no requirement that they be FDIC-insured or a "financial institution" within the meaning of the bank fraud statutes, and this would not have been a defense to the government's claims.

Thus, the failure of Mr. Elliott to raise what the Tenth Circuit has found to be a "frivolous" argument or theory at trial cannot be said to be objectively unreasonable and

outside the wide range of reasonable professional assistance.  Mr. Smith's counsel

therefore committed no error in this regard.  *See Johnson v. Cockrell*, 306 F.3d 249,

255 (5th Cir. 2008) ("Counsel does not render ineffective assistance by failing to make

frivolous arguments.").  Likewise, a defendant is not prejudiced (*i.e.*, does not suffer the

violation of a fundamental right), and his trial is not rendered fundamentally unfair, by

the failure of defense counsel to assert a meritless or "frivolous" argument or defense

theory.  *See United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999) ("An attorney's

failure to raise a meritless argument thus cannot form the basis of a successful

ineffective assistance of counsel claim because the result of the proceeding would not

have been different had the attorney raised the issue.").  Accordingly, Mr. Smith cannot

meet either prong of the *Strickland* standard in regard to his argument regarding

Colorado Mortgage Alliance and Centennial Leasing.

> b.    Another Person Using the Identity "Austin Ikeme"

Mr. Smith also asserts that his counsel's performance was deficient in that he

failed to interview potential witnesses about certain documents provided in discovery

that could indicate James Kinney was also falsely using the identity "Austin Ikeme" at

the time of the crime.  He first notes as to this argument that his counsel informed the

jury and court in his opening statement that "the evidence will show you, they knew that

Alton Smith could'nt [sic] buy a house for a million-two.  But Austin Ikeme could,

because James Kinney had handed Ben Serrano and Kim Meyers a name with a credit

score of 786."  (Am. Mot. at 6) (citation to the record omitted).  He asserts that his trial

counsel did not present any defense evidence in support of this argument, either

through Defendant's testimony or other defense evidence, "except through cross-examination", and that Mr. Elliott's actions and omissions helped the government's case. (*Id.* at 9.) Mr. Smith fails, however, to describe why his counsel's performance was deficient in connection with this argument or how Mr. Elliott's actions helped the government.

Mr. Smith admits that his counsel conducted cross examination relevant to this argument. The fact that Mr. Smith did not testify does not necessarily support his argument–"a criminal defendant's decision whether to testify lies squarely with the defendant." *United States v. Smith*, 421 F. App'x 889, 899 (10th Cir. 2011).[3] Further, there is no evidence or argument that counsel "prevent[ed] a determined defendant from testifying." *United States v. Espinoza*, 392 F. App'x 666, 668 (10th Cir. 2010). To the extent Mr. Smith argues that his counsel's performance was deficient in not presenting other defense evidence in support of the opening argument of counsel referenced by Mr. Smith, he fails to state what evidence should have been submitted or how it would have helped his case. Thus, Mr. Smith has not "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound strategy.'" *Strickland*, 466 U.S. at 689 (quotation omitted). He also did not show that any alleged errors had an adverse effect on the defense, as compared to "some conceivable effect." *Id.* at 693. Indeed, his argument is entirely speculative and undeveloped.

---

[3] While "defense counsel 'should inform the defendant that he has a right to testify ... [and] discuss with the defendant the strategic implications of choosing whether to testify'", *id.* (quotation omitted), Mr. Smith has not argued that Mr. Elliott failed to address these issues.

Mr. Smith also refers in both his amended motion and reply brief to documents produced by the government in discovery (*id.* at 6-7), and suggests that these documents connect James Kinney to Austin Ikeme, *i.e.*, that Mr. Kinney may have been using the fictitious name "Austin Ikeme." (*See* Am. Mot. at 7.) He asks the Court to "take a look at all of the government's discovery," (*id.* at 8), presumably in order to see if the Court can discern a basis for a claim that defense counsel provided constitutionally deficient representation to Mr. Smith, but fails to realize that the court cannot function as the movant's advocate. *Hall*, 935 F.3d at 1110.

It appears, however, that Mr. Smith is arguing that if his counsel had followed up on this evidence and performed an investigation, he may have been able to present evidence that James Kinney, rather than Mr. Smith, was the person using the "Austin Ikeme" name. While he argues that the documents produced by the government in discovery link James Kinney to Austin Ikeme, Mr. Smith offers no explanation as to who James Kinney is, how the documents specifically link James Kinney to Austin Ikeme, or how a connection between James Kinney and the referenced documents is in any way exculpatory with respect to the crimes for which Mr. Smith was convicted. Thus, Mr. Smith does not show that defense counsel's failure to investigate and/or admit these documents at trial fell below an objective standard of reasonableness.

As noted by the Supreme Court:

There are ... 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'. . . Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach.

*Harrington v. Richter*, 131 S. Ct. 770, 788–89 (2011) (internal quotation omitted).

Therefore, courts apply a "'strong presumption' that counsel's attention to certain issues

to the exclusion of others reflects trial tactics rather than sheer neglect." *Id.* at 790

(quotation omitted).  Mr.  Smith has not overcome that presumption, nor has he shown

how he was prejudiced in any way by the purported failure of his counsel to "investigate"

or use at trial the documents in question.

Moreover, none of the documents Mr. Smith references in connection with his

claim appear to pertain to any of the loans or transactions for which he was charged

and convicted.  Therefore, even if another person was also falsely claiming to be Austin

Ikeme at other times and with respect to other transactions, the overwhelming evidence

of Mr. Smith's fraudulent use of the name Austin Ikeme in the particular transactions

charged in the superseding indictment would not be negated or diminished in any way.

Indeed, the Tenth Circuit explained the evidence in depth that supported

Mr. Smith's use of the name Austin Ikeme.  As to the mortgage fraud counts, it stated:

> Applying the applicable standard of review and legal principles, it is clear
> from the evidence admitted at the trial a reasonable jury could find Mr. Smith
> guilty beyond a reasonable doubt of the mortgage loan fraud committed, and,
> therefore, the government's evidence supported the district court's denial of
> Mr. Smith's motion to acquit. First, as conceded by Mr. Smith on appeal, the
> government's evidence established the fictitious identity of Austin Ikeme was
> explicitly intertwined with and used by Mr. Smith, as shown by witness
> testimony that he admitted he: (1) interchangeably used his and the Ikeme
> identities as his own; (2) used the Ikeme identity when questioned about the
> first failed closing and when he attempted to use that identity to set up
> another checking account in December 2007; (3) purchased fictitious
> Colorado and California driver's licenses in the name of Austin Ikeme; and
> (4) used both his name and that of Austin Ikeme on paperwork intended for
> a name change. In addition, . . . at trial three individuals were able to
> positively identify Mr. Smith as the person using the Ikeme identity.

The fact other witnesses did not personally meet the person representing himself as Mr. Ikeme, receive the loan application documents from him in person, or identify him in court as Mr. Smith and the source of the fraudulent documents, does not negate his guilt or otherwise fail to establish he did not commit the fraud perpetrated. Instead, the direct and circumstantial evidence presented, together with the reasonable inferences to be drawn therefrom, were sufficient to establish beyond a reasonable doubt Mr. Smith perpetrated the mortgage loan fraud committed. This is because, in addition to the evidence establishing Mr. Smith used the Ikeme identity during the time in question, the government's evidence established that in November 2007 someone presenting himself as Austin Ikeme opened a checking account at Bank of the West and was also added to Mr. Smith's Bank of the West checking account for Marrick Entertainment. Around the same time, a person acting as Mr. Ikeme attempted to obtain loans for the purchase of the Vistancia Court property, using funds from the personal checking account of Austin Ikeme for the buyer's costs and providing a fake Colorado driver's license at the closing, which Mr. Smith later admitted to an investigator he purchased when questioned about its use at the closing. The same investigator positively identified Mr. Smith at trial as the person making this admission. This evidence alone is sufficient to tie Mr. Smith to the actions taken by the fictitious Mr. Ikeme in defrauding Wells Fargo.

In addition, a person identifying himself as Mr. Ikeme also told Mr. Bliesmer, who helped to facilitate the mortgage loans, that his previous name had been Alton Smith, when Mr. Bliesmer called and questioned him about the same fake driver's license presented at the first closing. At the next closing on the property, funds from Mr. Smith's wife's account were used for the purpose of covering Mr. Ikeme's closing costs, and those funds were deposited into Mrs. Smith's account by the same California entity, K & K, which had deposited those funds into Mr. Ikeme's personal checking account prior to the failed closing. Again, these actions show a direct connection between Mr. Ikeme and Mr. Smith for the purpose of showing Mr. Smith committed the fraudulent scheme perpetrated on Wells Fargo.

The documents supporting both mortgage loans also included the fake California driver's license Mr. Smith admitted purchasing as well as the fake Social Security number used throughout the fraudulent schemes perpetrated and which Mr. Smith also admitted using. Furthermore, the income documents submitted for Mr. Ikeme identified Marrick Entertainment as his employer, which was the company Mr. Smith incorporated and which listed Austin Ikeme as holding corporate officer positions. No evidence established anyone but Mr. Smith used the name Austin Ikeme in association with himself or Marrick Entertainment, and the same Marrick Entertainment

income information used for the mortgage loans was later used in the purchase of an automobile by Mr. Smith, where he was positively identified by a witness as the person providing that information.

Despite Mr. Smith's contentions he was not the person who purchased or provided the documents for purchase of the Vistancia Court residence, a witness testified he delivered three leased vehicles to Mr. Smith at that residence. He also identified Mr. Smith in court as the person he met with and knew both as "Alton" and Austin Ikeme. In addition, someone attempted to set up a personal checking account at Bank of the West in the name of Austin Ikeme using the Vistancia Court address. When a detective called the telephone number given for that person and address and later met with him in person, it was Mr. Smith he met with and who admitted he was Alton Smith but used the name Austin Ikeme. As previously mentioned, when another detective attempted to contact Mr. Smith, she also used that telephone number and talked with someone who acknowledged he was Alton Smith, but used the name Austin Ikeme, and who knew about the previous police station meeting and admitted to purchasing the California license. In addition, Mr. Smith admitted to a Wells Fargo employee his home had been foreclosed on due to dealings with an unscrupulous builder, which, assumably, was Mr. Serrano, who also deposited funds into a checking account which was eventually shown to be associated with Mr. Smith.

Altogether, the direct and circumstantial evidence presented by the government overwhelmingly showed a connection between Mr. Smith and the fictitious person Mr. Ikeme, the Vistancia property, and the fraudulent loan documents delivered to Wells Fargo on which it relied concerning the purchase of that property. Based on this evidence and the reasonable inferences drawn therefrom, a jury could readily find Mr. Smith guilty beyond a reasonable doubt of perpetrating the fraudulent acts committed. Moreover, the district court clearly found the government's witnesses and other evidence credible when it denied the motion to acquit, as did the jury when it convicted Mr. Smith of the mortgage loan fraud counts. Accordingly, we conclude the government's evidence supported the district court's denial of Mr. Smith's motion for acquittal.

*Smith*, 431 F. App'x at 624-26.  The Tenth Circuit found "[b]ased on much of the same

or similar direct and circumstantial evidence" that "a jury could .. . find Mr. Smith guilty

beyond a reasonable doubt of perpetrating the fraud committed concerning the personal

line of credit loan from Wells Fargo."  *Id.* at 626.  Based on this substantial evidence, I

find that Mr. Smith has not and cannot show that it is reasonably probable that the evidence he relies on would have altered the jury's verdict.

Mr. Smith also argues, however, in his third motion to expand the record (ECF No. 171) that two exhibits which were available to his defense counsel through discovery and not presented at trial show that there was another person acting as Austin Ikeme before the actual fraudulent acts were taking place, and that another line of credit of $100,000.00 was opened under the fraudulent name Austin Ikeme at the same time as Counts One and Two.  Exhibit 1 to the motion, a report prepared by the Parker Police Department, does contain language suggesting that someone other than Mr. Smith had assumed the identity of Ikeme—"On 11/5/07, Alton Smith came into the branch to add Austin O. Ikeme as a signer on this account.  He brought in another man that he introduced as Austin."  (ECF No. 171, Ex. 1 ¶ 1.)   Despite this language, Exhibit 1 strongly suggests that Mr. Smith ultimately posed as Austin Ikeme:

> ¶ 1 "The following day, Alton came back and signed the Gold Line credit approval as Austin O. Ikeme. On 11/1/07, Alton Smith came into the same branch ... and opened a personal account under the name of Austin O. Ikeme, account number 484-092473."

> ¶ 3 "[Smith] admitted to finding someone in the Denver Metro area and paying $250.00 for a fake ID under the name of Austin O. Ikeme."

(*Id.*)  As to Exhibit 2, Mr. Smith alleges that this exhibit will evidence various facts.  But his proffer, even if true, does not support an inference that someone other than Mr. Smith had acted as Ikeme.  In short, neither of these exhibits in any way overcome, negate or diminish the substantial evidence of Mr. Smith's fraudulent use of the name Austin Ikeme in the particular transactions charged in the superseding indictment.  Accordingly, I also find as

to this evidence that Mr. Smith has not and cannot show that it is reasonably probable that it would have altered the jury's verdict.

Finally, to the extent that Mr. Smith argues that Mr. Elliott's performance was deficient because he failed to investigate and interview potential witnesses, he fails to identify any such potential witness whose omitted testimony would have been relevant and admissible at trial under the rules of evidence, who would not have invoked the privilege against self-incrimination, or whose testimony would not have been potentially damaging to Mr. Smith's defense insofar as it might explain in detail where and how Mr. Smith obtained the information and documentation necessary for him to assume the fictitious identity of Austin Ikeme.  To prevail on an ineffective assistance claim based on counsel's failure to call a witness, the movant must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense. *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009); *see also Snow v. Sirmons*, 474 F.3d 693, 730 n.42 (10th Cir. 2007) (finding that even if the failure to call a witness "had been unreasonable, '[t]o affirmatively prove prejudice, [the movant] ... must show not only that the testimony of [an] uncalled witness[ ] would have been favorable, but also that [the] witness [ ] would have testified at trial'") (quotation omitted).

In this case, Mr. Smith has failed to even demonstrate that there was another witness or witnesses whose testimony would have negated the overwhelming testimony against him.  Thus, it cannot reasonably be said that a decision by counsel not to

-30-

interview and call to testify at trial the unspecified "potential witnesses" to whom

Mr. Smith is vaguely alluding in his amended § 2255 motion—assuming, of course, that

counsel did not, in fact, interview any of these unspecified "potential witnesses"—is

objectively unreasonable and outside the wide range of reasonable professional

assistance.  "[T]he decision of which witnesses to call is quintessentially a matter of

strategy for the trial attorney".  *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008).

Mr. Smith fails to recognize that "the speculative witness is often a two-edged sword. . .

[f]or as easily as one can speculate about favorable testimony, one can also speculate

about unfavorable testimony."  *Id.* at 1138.

      C.    <u>Conclusion as to the § 2255 Motion</u>

Based on the foregoing, I find that Mr. Smith cannot meet either prong of the

*Strickland* standard to demonstrate that he received constitutionally deficient

representation in connection with either of his claims.  "Given the weight of the evidence

against him, and the highly speculative nature of the allegations made by [Mr. Smith] to

support ineffectiveness, there was 'no reasonable probability that, had counsel not

committed the errors [Mr. Smith] now claims were committed, the outcome of the case

would have been different."  *Boyle*, 544F.3d at 1138.  This is also true to the extent that

Mr. Smith attempts to allege ineffective assistance of counsel as to other acts or

omissions that I have not specifically addressed.

I also deny Mr. Smith's Motion for an Evidentiary Hearing, finding that an

evidentiary hearing is not necessary.  The motions, files, and records of the case

conclusively show that Mr. Smith is not entitled to relief.  28 U.S.C. § 2255(b).

IV.     CONCLUSION

In conclusion, it is

ORDERED that Mr. Smith's first Motion to Expand the Record (ECF No. 169) is

**DENIED.** It is

FURTHER ORDERED that Mr. Smith's second and third Motions to Expand the

Record (ECF Nos. 170 and 171) are **GRANTED** consistent with this Order. It is

FURTHER ORDERED that Mr. Smith's "Motion for a New Trial Pursuant to Rule

33(b)(1), Fed.R.Cr.P. Upon Presentation of Newly Discovered Evidence" (ECF No. 175)

is **DENIED**. It is

FURTHER ORDERED that Mr. Smith's Motion and Amended Motions Under 28

U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (ECF Nos. 145 and 164) are

**DENIED**. Finally, it is

ORDERED that Mr. Smith's Motion for an Evidentiary Hearing (ECF No. 176) is

**DENIED**.

Dated: December 18, 2013

BY THE COURT:


s/ Wiley Y. Daniel
Wiley Y. Daniel
Senior United States District Judge